**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**TYLER DIVISION**

| | | |
|---|---|---|
| BENEFICIENT and BRAD HEPPNER, | § § § § | |
| Plaintiffs, | § § § | |
| v. | § § | Case No. 6:23-cv-376-JDK |
| ALEXANDER GLADSTONE, | § § § | |
| Defendant. | § § § | |

**MEMORANDUM OPINION AND ORDER**
**DENYING MOTION TO DISMISS**

This is a defamation case.  Plaintiffs—Texas corporation Beneficient and its founder, CEO, and chairman Brad Heppner—were involved in a series of business transactions between 2019 and 2022 that ended with the bankruptcy of GWG Holdings, Inc.  Defendant Alexander Gladstone is an investigative reporter working for *The Wall Street Journal*.  Gladstone wrote an article for *The Journal* describing these transactions and detailing how Plaintiffs allegedly profited from them.  He also tweeted a link to the article, along with a short description of it.  Plaintiffs allege that the "gist" of the article and tweet deliberately defamed them and damaged their reputations and economic livelihoods.

Gladstone now moves to dismiss the complaint under Federal Rule of Civil Procedure 12(b)(6).  He argues that the publications are not defamatory.  He also contends that the publications are privileged under Texas law, that they provide protected opinion, and that Plaintiffs failed to allege he acted with "actual malice."

1

The Court denies the motion.  As explained below, Plaintiffs have alleged a defamatory gist that is "reasonably capable of arising from the text" of the article and tweet.  *Dall. Morning News, Inc. v. Tatum*, 554 S.W.3d 614, 625 (Tex. 2018). Gladstone, moreover, has not shown that the publications are statutorily privileged as accurate reports of official proceedings or of third-party allegations.  *See Dall. Morning News, Inc. v. Hall*, 579 S.W.3d 370, 380 (Tex. 2019).  Nor are the publications protected opinion, but rather are statements "capable of objective proof as true or false."  *Scripps NP Operating, LLC v. Carter*, 573 S.W.3d 781, 795 (Tex. 2019).  And, finally, Plaintiffs have adequately alleged actual malice by stating, among other things, that they "repeatedly notified Gladstone of specific factual errors" in the article and that Gladstone nevertheless rejected or ignored their corrections to "serve his preconceived agenda."  Docket No. 1 ¶ 7.  *Cf. Walker v. Beaumont Indep. Sch. Dist.*, 938 F.3d 724, 744–45 (5th Cir. 2019).

## I.

The following facts are from Plaintiffs' complaint.  In ruling on the motion to dismiss, the Court must accept as true the complaint's well-pleaded facts and view them in the light most favorable to Plaintiffs.  *Raj v. La. State Univ.*, 714 F.3d 322, 330 (5th Cir. 2013); *Campbell v. Wells Fargo Bank, M.A.*, 781 F.2d 440, 442 (5th Cir. 1986).

## A.

Plaintiff Brad Heppner is a "trailblazer" and "innovator" in the "alternative asset sector of the financial services industry."  Docket No. 1 ¶ 22.  Among other things, Heppner has "held positions at the John D. and Catherine T. MacArthur charitable foundation and Bain & Company," "has founded more than ten companies," and "serves on the advisory board of the Cox School of Business at Southern Methodist University."  *Id*. ¶¶ 20–23.  In 2003, Heppner founded Beneficient.  *Id*. ¶ 26.  Beneficient is a corporation presently focused on "creating a more investor-friendly and regulated approach to alternative asset supervision, management, and liquidity."  *Id*. ¶ 26.  Heppner is Beneficient's Chairman and CEO. *Id*. ¶ 26.

In 2018, GWG Holdings began investing in Beneficient.  *Id*. ¶ 36.  GWG is a publicly traded company whose "historical business was primarily buying life insurance policies in the secondary market."  *Id*. ¶ 34.  To raise capital for these purchases, GWG sold public debt securities called "L Bonds."  *Id*. ¶ 35.  In January 2018, GWG decided to invest in Beneficient to diversify its business.  *Id*. ¶ 36.  Plaintiffs allege they "had no prior knowledge of GWG, its founders, Board of Directors or management prior to the months leading up to GWG's decision to invest in Beneficient."  *Id*. ¶ 37.

GWG invested approximately $230 million in Beneficient net of cash realizations and distributions to GWG.  *Id*. ¶ 38.  Plaintiffs contend that, at the time Gladstone published the article and tweet, the value of GWG's investment "was

substantially more than the amount [originally] invested"—and that the original investment was thus "highly successful." *Id*. ¶ 38.  In April 2019, Heppner became chairman of the board of GWG; several other Beneficient representatives later joined him on the board of directors. *Id*. ¶¶ 39–40.  In December 2019, GWG acquired the right to appoint the majority of Beneficient's board of directors. *Id*. ¶¶ 41–42.  Plaintiffs insist that "GWG was not controlled by Beneficient or Heppner during this time and has never been controlled by either of them." *Id*. ¶42; *see also* ¶¶ 37, 39, 42–43.  Plaintiffs also state that "special committees," of which Heppner was not a member, made the decisions to invest in Beneficient. *Id*. ¶ 43.

In April 2022, GWG filed for Chapter 11 bankruptcy. *Id*. ¶ 44.  By that point the GWG-Beneficient relationship had terminated, and Heppner and the other Beneficient representatives had left GWG's board to "address concerns raised by state officials assisting in the chartering of certain of Beneficient's regulated business lines." *Id*. ¶ 44.  Plaintiffs claim that GWG's bankruptcy was "due to other issues primarily related to the historical life insurance business and bond issuance program," "[d]espite its successful investments in Beneficient." *Id*.

### B.

Enter Gladstone.  On July 22, 2022, Gladstone—working on a story for *The Journal*—contacted Plaintiffs' representatives, stating that he was investigating Heppner, Beneficient, and GWG, and had "determined" several "facts."  Gladstone offered Plaintiffs an opportunity to "comment or provide insight[]." *Id*. ¶¶ 45–46; *see also id.*, Ex. B at 5–6.  The parties exchanged a flurry of emails over the next week as

Plaintiffs disputed Gladstone's characterization of the events and transactions.  *Id.*
¶¶ 51–66; *see also id.*, Exs. B–E.  For example, Gladstone referred to the GWG-
Beneficient transaction as a "takeover" of GWG by Heppner.  *Id.* ¶ 64.  Plaintiffs
challenged the claim, asserting that "GWG had decided to invest in Beneficient as
part of a larger strategy to diversify *before* Heppner became chairman of GWG's
board" and explaining that GWG had retained its independence throughout the deal.
*Id.* ¶ 65; *see also id.*, Ex. E.  Plaintiffs also clearly stated that Gladstone's "insinuated
conclusions" are "not only misleading but materially false" and that Gladstone's
version had "numerous factual inaccuracies throughout."  *Id.* ¶ 51.

On July 29, 2022, one week after his initial email, Gladstone published an
article in the *The Journal* titled "An Asset-Management Merger Ended in
Bankruptcy, While Its Architect Got $174 Million."  *Id.* ¶ 67; Docket No. 20, Ex. 25.
The article stated that, after "gaining effective control of GWG in 2019," Heppner and
Beneficient "collected at least $174 million in cash, loan repayments, and other
benefits" before GWG's bankruptcy.  Docket No. 20, Ex. 25 at 2.  It singled out
Heppner's gains, stating that "capital contributions from GWG" allowed Heppner to
"repay debt he had incurred to buy and develop a nearly 1,500-acre ranch in Texas,
and provid[ed] him with access to private jets."  *Id.*  The article also described the
various problems GWG faced, including its bankruptcy, an SEC investigation, and
lawsuits from investors—"many of them elderly and retired"—who were "owed $1.3
billion."  *Id.* at 2–3.  The article included comments from Plaintiffs' representatives,
as well as attributions to documents and sources on which Gladstone relied.  *See*

*generally id.*  Plaintiffs allege that the article was "designed to give the impression that Heppner was pulling the strings of GWG while it 'transferred' money to Beneficient, and that Beneficient was merely a vehicle for Heppner's self-enrichment."  Docket No. 1 ¶ 76.

The same day, Gladstone tweeted a link to the article, along with a two-sentence description:  "Beneficient CEO Brad Heppner used money from retail investors to help fund his lavish lifestyle.  Those investors, many of them elderly and retired, are now facing up to $1.3 billion in losses."  *Id.* ¶ 101; *id.*, Ex. A.[1]  Plaintiffs state that they "continued to provide Gladstone with information refuting and correcting Gladstone's claims" even after he published the article and tweet.  *Id.* ¶ 110.

### C.

Almost one year later, Plaintiffs sued Gladstone for state-law defamation.[2]  The complaint asserts three counts:  Count One alleges defamation per se by implication for the overall gist of the tweet.  *Id.* ¶¶ 122–34.  Count Two alleges defamation per se by implication for the overall gist of the article.  *Id.* ¶¶ 135–46.  And Count Three alleges defamation per se by implication for specific statements within the article.  *Id.* ¶¶ 147–61.  Plaintiffs seek compensatory damages, punitive damages, and attorneys' fees.  *Id.* at 35.

---

[1]  While Twitter is now known as "X" and tweets as "posts," the Court will retain the prior terminology because the parties do so.

[2]  The Court has subject matter jurisdiction under 28 U.S.C. § 1332 because Plaintiffs are citizens of Texas and Gladstone is a citizen of New York.  Docket No. 1 ¶¶ 12–14.

Gladstone now moves to dismiss the action under Federal Rule of Civil Procedure 12(b)(6). Docket No. 20. He argues that a defamation claim is not cognizable on these facts for multiple, independent reasons. *Id.* at 14.

## II.

The Court provides a brief background of the law governing Gladstone's motion to dismiss—both procedurally and substantively.

### A.

A complaint in federal court must include "a short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2). If a plaintiff fails to satisfy Rule 8(a)(2), the defendant may move to dismiss under Rule 12(b)(6), which authorizes dismissal of a complaint for "failure to state a claim upon which relief can be granted." To survive a Rule 12(b)(6) motion, a plaintiff must plead "enough facts to state a claim that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim will have "facial plausibility when the plaintiff pleads factual content that allows the Court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). As noted above, in deciding a motion to dismiss under Rule 12(b)(6), the Court will accept "all well-pleaded facts in the complaint as true and view[] [them] in the light most favorable to the plaintiff." *Raj*, 714 F.3d at 330.

In the Fifth Circuit, motions to dismiss are "viewed with disfavor and are rarely granted." *Lormand v. US Unwired, Inc.*, 565 F.3d 228, 232 (5th Cir. 2009) (citation omitted); *see also Altman v. Key Energy Servs., LLC*, 2012 WL 4033336, at *2

(E.D. Tex. Sept. 12, 2012).  A claim may be dismissed only if the plaintiff "would not be entitled to relief under any set of facts or any possible theory that [it] could prove consistent with the allegations in the complaint.*" Muhammad v. Dall. Cty. Cmty. Supervision & Corrs. Dep't*, 479 F.3d 377, 380 (5th Cir. 2007); *see also Altman*, 2012 WL 4033336, at *1.  It must appear beyond doubt that the plaintiff can prove no set of facts in support of the claim entitling him to relief.  *Griffith v. Kroger Co.*, 2008 WL 11347989, at *2 (E.D. Tex. Mar. 7, 2008).

When the Court considers a Rule 12(b)(6) motion to dismiss, it "must limit itself to the contents of the pleadings."  *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498 (5th Cir. 2000).  The Court may, however, "consider documents attached to the complaint."  *Kennedy v. Chase Manhattan Bank USA, NA*, 369 F.3d 833, 839 (5th Cir. 2004).  Further, "[d]ocuments that a defendant attaches to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to [its] claim."  *Causey v. Sewell Cadilac-Chevrolet, Inc.*, 394 F.3d 285, 288 (5th Cir. 2004).

## B.

Substantively, Texas law governs here.  *Wisznia Co. v. Gen. Star Indem. Co.*, 759 F.3d 446, 448 (5th Cir. 2014) ("A federal court sitting in diversity applies the substantive law of the forum state . . . .").  "In applying Texas law, [the Court] look[s] first to the decisions of the Texas Supreme Court."  *Hux v. S. Methodist Univ.*, 819 F.3d 776, 780 (5th Cir. 2016).

In Texas, the tort of defamation requires "the publication of a false statement of fact to a third party." *Tatum*, 554 S.W.3d at 623 (Tex. 2018); *see also Roe v. Patterson*, 668 F. Supp. 3d 582, 591 (E.D. Tex. 2023). The false statement must defame the plaintiff, the defendant must make the statement with the requisite degree of fault, and—in some cases—the plaintiff must prove damages. *Tatum*, 554 S.W.3d at 623. The threshold inquiry in every defamation case is "whether the words used 'are reasonably capable of a defamatory meaning.'" *Id.* at 624 (quoting *Musser v. Smith Protective Servs., Inc.*, 723 S.W.2d 653, 655 (Tex. 1987)). The inquiry is objective, not subjective. *Id.* "But if the court determines the language is ambiguous, the jury should determine the statement's meaning." *Id.*

Texas law recognizes defamation by implication. "In a defamation-by-implication case, the defamatory meaning arises from the statement's text, but it does so implicitly." *Id.* at 627; *see also Turner v. KTRK Television, Inc.*, 38 S.W.3d 103 (Tex. 2000). In determining whether a publication implies a defamatory meaning, a court should examine the publication's "gist," that is, "constru[ing] the publication 'as a whole.'" *Tatum*, 554 S.W.3d at 628 (quoting *D Magazine Partners, L.P. v. Rosenthal*, 529 S.W.3d 429, 434 (Tex. 2017)). "Gist" refers to a publication's "main theme, central idea, thesis, or essence." *Id.* Even if all the discrete facts within a publication are true, the publication's gist can still be defamatory if the publication "omit[s] material facts or juxtapos[es] facts in a misleading way." *Id.* at 627. Accordingly, Texas law recognizes "that a plaintiff can rely on an entire publication to prove that a defendant has implicitly communicated a defamatory statement." *Id.*

9

Of course, both the U.S. and Texas constitutions "robustly protect freedom of speech." *Id.* at 624 (quoting *Rosenthal*, 529 S.W.3d at 431). Thus, "[f]or a court to subject a publisher to liability for defamation by implication, the 'plaintiff must make an especially rigorous showing' of the publication's defamatory meaning." *Id.* at 633 (quoting *Chapin v. Knight-Ridder, Inc.*, 993 F.2d 1087, 1092–93 (4th Cir. 1993)). Likewise, judges bear a "special responsibility." *Id.* at 624 (quoting *Bose Corp. v. Consumers Union of U.S., Inc.*, 466 U.S. 485, 505 (1984)). In particular, the Court must ensure that its decision does not "exert too great a 'chilling effect' on First Amendment activities." *Id.* at 632; *see also Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 341 (1974) ("[W]e have been especially anxious to assure to the freedoms of speech and press that 'breathing space' essential to their fruitful exercise.") (citation omitted).

With an eye on those constitutional concerns, the Texas Supreme Court has adopted the following limit on the inquiry into a publication's meaning:

> [I]f a communication, viewed in its entire context, merely conveys materially true facts from which a defamatory inference can reasonably be drawn, the libel is not established. But if the communication, by the particular manner or language in which the true facts are conveyed, supplies additional, affirmative evidence suggesting that the defendant *intends* or *endorses* the defamatory inference, the communication will be deemed capable of bearing that meaning.

*Id.* at 635 (quoting *White v. Fraternal Ord. of Police*, 909 F.2d 512, 520 (D.C. Cir. 1990)). "Thus, a plaintiff who seeks to recover based on a defamatory implication—whether a gist or a discrete implication—must point to 'additional, affirmative evidence' within the publication itself that suggests the defendant 'intends or endorses the defamatory inference.'" *Id.* (quoting *White*, 909 F.2d at 520).

10

The mere existence of a defamatory gist is "presumptive evidence that the publisher intended to convey the relevant meaning." *Id.* at 636. But no such presumption exists for implication-by-specific-statement claims. In those cases, it is "especially relevant for the court to apply the requirement that the publication's text demonstrates the publisher's intent to convey the meaning." *Id.* In doing so, the Court must conduct an objective—not subjective—inquiry, looking only to "evidence of intent [] aris[ing] from the publication itself. *See id.* at 635–36.

With that background in mind, the Court turns to Gladstone's arguments.

### III.

Gladstone first argues that all three counts should be dismissed because the "publications are not reasonably susceptible to a defamatory meaning." Docket No. 20 at 15–22. The Court disagrees.

### A.

As noted above, the threshold inquiry in every defamation case is whether the words are "reasonably capable" or "reasonably susceptible" of a defamatory meaning. *Tatum*, 554 S.W.3d at 624 (quotation omitted). In answering that question, the Court follows a two-step test. *See id.* at 625; *Parker v. Spotify USA, Inc.*, 569 F. Supp. 3d 519, 529 (W.D. Tex. 2021). First, the Court determines whether the meaning alleged by Plaintiffs is "reasonably capable of arising from the text." *Tatum*, 554 S.W.3d at 625. Again, this is an objective—not subjective—inquiry. *Id.* at 631 (citing *New Times, Inc. v. Isaacks*, 146 S.W.3d 144, 157 (Tex. 2004)). The Court must place itself in the shoes of the "objectively reasonable reader:"

11

> The objectively reasonable reader aids in the inquiry, as a prototype . . . who exercises care and prudence, but not omniscience, when evaluating allegedly defamatory communications.  He does not place overwhelming emphasis on any single term.   Nor does he focus on individual statements to the exclusion of the entire publication.  The objectively reasonable reader internalizes all of a publication's reasonable implications.  When doing so, he considers inferential meaning carefully, but not exhaustively.  He performs analysis, but not exegesis.

*Id.* (cleaned up).  The Court need not "map out every single implication" of a publication.  *Id.*  Rather, it must simply determine whether Plaintiffs' alleged implication "is among the implications that an objectively reasonable reader would draw."  *Id.*  If so, the Court will consider whether there is "'additional, affirmative evidence' within the publication itself that suggests [Gladstone] 'intends or endorses the defamatory inference.'"  *Id.* at 635 (quoting *White*, 909 F.2d at 520).

Second, the Court must determine whether the alleged meaning is "reasonably capable of defaming" Plaintiffs.  *Id.* at 625.  As relevant here, libel is defamatory if it "tends to injure a living person's reputation and thereby expose the person to public hatred, contempt or ridicule, or financial injury or to impeach any person's honesty, integrity, virtue, or reputation."  TEX. CIV. PRAC. & REM. CODE 73.001.

### B.

Counts One and Two allege that the gist of the tweet and article—respectively—defame Plaintiffs.  Docket No. 1 ¶¶ 122–146.  Plaintiffs contend that the tweet and article share the following gist: "Heppner and Beneficient engineered a sham transaction between GWG and Beneficient that allowed Heppner to buy the Ranch and use private jets with these wrongfully obtained corporate funds—all at the expense of elderly and retired investors who now face $1.3 billion in losses."  *Id.*

¶¶ 125, 137.  Plaintiffs allege that the gist "tend[s] to injure [their] reputations . . . expose them to public hatred, contempt, ridicule, and financial injury, and impeach their honesty, integrity, virtue, and reputations."  *Id.* ¶¶ 129, 143.  They also allege that the gist is defamatory *per se*.  *Id.* ¶¶ 130, 144.

Gladstone argues the alleged gist "is not objectively reasonable" because it is "based on a skewed view of a handful of words and phrases out of context."  Docket No. 19 at 16–18.  For example, he argues that an objectively reasonable reader would not view the tweet's phrase "lavish lifestyle" as communicating that Heppner was a "criminal or fraudster."  *Id.* at 17–18.  Likewise, he argues that neither the article nor the tweet "suggest that there was a 'sham transaction between GWG and Ben[]' or 'wrongfully obtained' funds."  *Id.* at 17.  Thus, he argues that the article and tweet "are not defamatory as a matter of law."  *Id.* at 22.

Gladstone's argument is unpersuasive.  An objectively reasonable reader could very well draw the alleged defamatory gist from the article and tweet, when considering them as the *Tatum* Court instructs.  Start with the article's first sentence, which states that Heppner "promis[ed] to reinvigorate [GWG] by pivoting into new alternative asset classes."  Docket No. 20, Ex. 25 at 2.  The article then continues that, "[i]nstead," Heppner "collected as least $174 million in cash, loan repayments and other benefits" from GWG before it went bankrupt, "leaving thousands of individual investors owed $1.3 billion."  *Id.*  An objectively reasonable reader could interpret the juxtaposition of (1) Heppner's unfulfilled promise and (2) his enormous gain at the expense of individuals to mean that he deceitfully took control of GWG for

the purpose of enriching himself, without regard for GWG's business or its investors. *See White*, 909 F.2d at 519–20 (collecting cases where the juxtaposition of true statements implied a defamatory meaning). The article continues in this way throughout, as Plaintiffs detail at length in the complaint. *See* Docket No. 1 ¶¶ 64–100. Further, Plaintiffs allege that the article repeatedly omits certain material facts that would change the gist entirely in their favor. *See id.*; *Turner*, 38 S.W.3d at 115 (noting that a publication can imply a defamatory meaning "by omitting material facts").

Likewise, consider the tweet's two sentences. There, Gladstone first states that "Heppner used money from retail investors to help fund his lavish lifestyle," then asserts that "[t]hose investors, many of them elderly and retired, are now facing up to $1.3 billion in losses." Docket No. 1, Ex. A. Again, an objectively reasonable reader could interpret the juxtaposition of these two sentences to mean that Heppner had "wrongfully obtained corporate funds" from GWG "at the expense of [its] elderly and retired investors." Docket No. 1 ¶¶ 125, 137; *White*, 909 F.2d at 519–20.

Gladstone also argues that the "statements *actually* in the Article expressly contradict" Plaintiffs' alleged gist. Docket No. 19 at 17 (emphasis in original). For example, Gladstone contends that the article "does not imply at all that money from GWG allowed Heppner to *buy* the ranch" and instead states that "GWG made capital contributions to [Beneficient], and the funds were then *distributed* to Heppner and affiliated entities, helping him *repay the debt he had incurred* to buy and develop the ranch." *Id.* (cleaned up). But an objectively reasonable reader could miss this

14

technical distinction or could see it as immaterial.  This fact certainly does not defeat the overall reasonableness of the alleged defamatory gist.  Gladstone asserts that the article "repeatedly references disclosures in 'public securities filings' [] made by [Plaintiffs] themselves" and "provides Plaintiffs' explanations for the various referenced transactions."  *Id.*  Even so, it's not clear how these references render the alleged gist unreasonable—after all, a publication consisting entirely of facts that are "literally or substantially true" may still defame by its implication.  *Turner*, 38 S.W.3d at 115.

Finally, Gladstone argues that Plaintiffs have failed to point to the "additional, affirmative evidence of intent" required by *Tatum*.  554 S.W.3d at 635 (cleaned up); Docket No. 19 at 18.  But as Plaintiffs observe, the tweet links together intentionally sensational language in short succession, stating that Plaintiffs "used money" from "elderly and retired" investors to "fund [Heppner's] lavish lifestyle."  Docket No. 1, Ex. A.  And the article repeatedly juxtaposes facts and uses provocative language in ways to convey the defamatory gist identified by Plaintiffs.  That is sufficient evidence that Gladstone intended to convey the defamatory gist.  *See Tatum*, 554 S.W.3d at 635–36 (noting that "the evidence of intent must arise from the publication itself" and providing "myriad considerations" for courts to weigh in determining intent).  In addition, *Tatum* held that, "if a meaning is reasonably capable of being communicated from the gist as a whole, the fact that the gist arises will be sufficient textual evidence that the publisher meant to communicate it."  *Id.* at 636.  And here, Plaintiffs' alleged defamatory meaning is reasonably capable of being communicated from the article

and tweet, meaning that Gladstone necessarily "intended to convey the meaning that [Plaintiffs] allege." *Id.*

Alternatively, Gladstone briefly argues that, even if Plaintiffs' alleged gist is reasonably capable of arising from the text, it is not defamatory. Gladstone says that the article and tweet "merely suggest, at most, a common event in today's world: A business venture failed and the entrepreneur nonetheless gained from the endeavor." Docket No. 19 at 18. That is implausible. Communicating that Plaintiffs "engineered a sham transaction" to fund a "lavish lifestyle" at the expense of "elderly and retired investors" is plainly defamatory. It would obviously "tend[] to injure [Plaintiffs'] reputation and thereby expose [them] to public hatred, contempt or ridicule." TEX. CIV. PRAC. & REM. CODE § 73.001.

Accordingly, the Court concludes that Plaintiffs sufficiently pleaded that the article and tweet are defamatory and **DENIES** Plaintiffs' motion to dismiss Counts One and Two on this basis.

## C.

Count Three alleges that two specific statements in the article defame Plaintiffs:

- "GWG also transferred $230 million to Beneficient Co. Group LP, a financial-services startup founded and led by Heppner."

- "Much of those capital contributions from GWG were then distributed to Heppner and his affiliated business entities, helping him repay debt he had incurred to buy and develop a nearly 1,500-acre ranch in Texas, and providing him with access to private jets among other benefits . . . ."

Docket No. 1 ¶ 149; *see also* Docket No. 20, Ex. 25 at 2.  Plaintiffs allege the first statement defames them because "the intentional use of the word 'transfer' implies that Heppner and Beneficient improperly orchestrated a sham payment from GWG that they then wrongfully allocated to enrich Heppner, all to the detriment of 'elderly and retired' investors."  *Id.* ¶ 151.  Likewise, they allege that the second statement is "false and defamatory because it suggests that Heppner and Beneficient used the wrongfully obtained funds from the so-called 'transfer' for two personal benefits directed to Heppner: the purchase and development of the Ranch and access to private jets."  *Id.* ¶ 152.  Gladstone once again argues these statements "do not reasonably convey what Plaintiffs allege and are not defamatory."  Docket No. 19 at 19–22.[3]

The Court agrees with Plaintiffs that their proposed meanings are "reasonably capable of arising from the text" and are defamatory.  *Tatum*, 554 S.W.3d at 625.  The word "transfer" here can suggest a sham payment for Plaintiffs' personal benefit, rather than a legitimate investment—an easily defamatory statement.  And the second sentence, which immediately follows the sentence with "transfer," can mean that Plaintiffs wrongfully used the payment to fund Heppner's personal, wealthy lifestyle, also defamatory.  *See Rosenthal*, 529 S.W.3d at 431–32 (denying a motion to dismiss a defamation claim based on an article stating that the plaintiff "has figured

---

[3] Gladstone analyzes "eight individual statements from the Article, plus the Tweet" in his motion to dismiss.  Docket No. 19 at 19.  But, as Plaintiffs point out, Count Three challenges only two statements, what Gladstone refers to as Statements 4 and 5.  *See id.* at 20–21; Docket No. 20,, Ex. 26; Docket No. 22 at 8–9; Docket No. 1 ¶ 149.  The Court limits its analysis to these two statements.

out how to get food stamps while living in the lap of luxury.").  Gladstone cites no authority to the contrary.

Gladstone also argues that the complaint "does not (and cannot) point to 'additional, affirmative evidence'" that he intended or endorsed the defamatory meaning in these sentences.  Docket No. 19 at 22 (quoting *Tatum*, 554 S.W.3d at 635). But the Court has already found evidence that Gladstone intended the defamatory gist of the article and tweet, which is nearly identical to the alleged defamatory meaning of the two sentences.  Further, the "myriad considerations" identified by *Tatum* suggest that Gladstone intended the defamatory meaning here:  the first statement does not disclose its factual basis, and neither statement recites accusations made by others nor specifically includes facts that negate the defamatory implications.  *See* 554 S.W.3d at 635.

The Court thus **DENIES** Defendants' motion to dismiss Count Three on this ground.

## IV.

Gladstone next argues that all three counts should be dismissed because the article, tweet, and specific statements "are privileged as substantially accurate reports of official proceedings and third-party allegations."  Docket No. 19 at 14, 23–26.

Texas has codified two statutory defenses for media defendants that are relevant here.  First, "a fair, true, and impartial account of . . . an official proceeding . . . to administer the law" is "privileged and is not a ground for a libel action."  TEX.

CIV. PRAC. & REM. CODE 73.002(a), (b). As the Texas Supreme Court explained, "[t]he media enjoy a privilege to report on judicial and official proceedings without regard for whether the information from such proceedings is actually true." *Hall*, 579 S.W.3d at 380. "And while the defendant must prove the applicability of the privilege, the plaintiff bears the burden to prove the report was false." *Id.* at 380. "That burden is not met with proof that the report was not a substantially true account of the actual facts outside the proceedings," but rather requires the plaintiff to show that "the gist of the report was not substantially true—that is, that the report was not a fair, true, and impartial account of the proceedings." *Id.* at 381.

Similarly, Texas law protects "an accurate reporting of allegations made by a third party regarding a matter of public concern." TEX. CIV. PRAC. & REM. CODE 73.005(b); *Hall*, 579 S.W.3d at 380 ("[M]edia outlets that accurately report allegations made by a third party about matters of public concern can assert truth as a defense."). "And because this third-party-allegation rule—like the official-proceeding privilege—bears on substantial truth, the plaintiff has the burden under the [Texas Citizens Participation] Act to show falsity at the motion-to-dismiss stage." *Hall*, 579 S.W.3d at 380.

Gladstone claims that these statutory defenses apply here because the article and tweet "are true statements related to an SEC investigation, the bankruptcy proceeding, SEC filings, and private lawsuits" and are "an accurate report of allegations in GWG's press release and SEC filings." Docket No. 19 at 23. In support, Gladstone attaches twenty-six exhibits to his motion to dismiss, totaling more

than 370 pages.  Among the exhibits are numerous GWG and Beneficient SEC filings and press releases, as well as documents from court proceedings involving GWG and other entities.  The final exhibit is a table listing statements from the article next to statements from the complaint in this case, various exhibits, and communications between Plaintiffs and Gladstone.  Gladstone summarizes it all by arguing:

> The gist of [the article and tweet]—as compared to the gist of court documents, SEC filings, GWG's press release, and the emails attached to the Complaint (ECF 1-5)—is substantially true.  Without repeating the raft of disclosures documented in the above statement of facts, it is clear that the isolated words that Plaintiffs scrutinize are no more damaging to [their] reputation than a truthful statement would have been.

*Id.* at 25 (cleaned up).

As an initial matter, the Court is skeptical that Gladstone has successfully invoked the media privilege on this record.  Gladstone has not, for example, identified a handful of specific official-proceeding documents and shown how they support the key defamatory statements at issue, as the defendant did in *Walker*, 938 F.3d at 746.  Nor does Gladstone contend that the critical defamatory statement was quoted directly from another publication, as in *Bostic v. Daily Dot, LLC*, 2023 WL 2317789, at *8 (W.D. Tex. Mar. 1, 2023).  Instead, Gladstone has submitted hundreds of pages of financial and other documents, claims that their "gist" supports the defamatory gist identified by Plaintiffs, and seeks dismissal under Rule 12(b).  No case cited by the parties supports that result.

In any event, the article and tweet are not an accurate reporting of the hundreds pages Gladstone submitted.[4]  Although some portions of the article and tweet do accurately reflect portions of Gladstone's submission, many of the key statements giving rise to the alleged gist do not.  For example, the article states that Heppner "promis[ed] to reinvigorate" GWG.  Docket No. 20, Ex. 25 at 2.  But none of Gladstone's exhibits reveals such a promise.  Likewise, the article states that Heppner "engineered" the "takeover" of GWG.  *Id.*, Ex. 25 at 2.  But again, none of Gladstone's exhibits provides any support for that assertion.  In fact, many of the exhibits describe the transaction as an arms-length agreement between parties with legitimate business purposes, not a "takeover" masterminded by Heppner for his own personal benefit.  *See, e.g., id.*, Exs. 1–2, 5.

Some of the statements that do accurately reflect information in the exhibits, moreover, fail to attribute their source adequately.  For example, the article's statement that Heppner "gained effective control of GWG in 2019" closely mirrors an allegation made by the SEC in a civil complaint against unrelated parties.  *Id.*, Ex. 25 at 2; Ex. 23 at 6.  But the article neither quotes nor refers to the complaint—it simply states that Heppner "gained effective control," without any sourcing language.  *Cf.,*

---

[4] As Plaintiffs observe, the Court is addressing a motion to dismiss under Rule 12(b)(6), which should not ordinarily involve comparing a complaint's allegations with documents submitted by the movant.  But that is essentially what the Fifth Circuit approved in *Walker*.  In that case, the district court determined that a media defendant was entitled to dismissal under Rule 12 in part because the publications at issue were privileged under TEX. CIV. PRAC. & REM. CODE 73.002—after comparing the articles to "[plaintiff's] indictments in state court, previous criminal proceedings, and related government documents."  938 F.3d at 748–49.  The Fifth Circuit affirmed.  *See id; see also id.* at 737–38 (noting that the "burden-shifting framework" imposed by the Texas Citizens Participation Act "cannot apply in federal court" and thus limiting its analysis to dismissal under Rule 12) (citing *Klocke v. Watson*, 936 F.3d 240 (5th Cir. 2019)).

*e.g., Gallaher v. Denton Media Co.*, 2022 WL 2071779, at *9 (Tex. App.—Fort Worth 2022, no pet.) (noting that privileged article "expressly qualified its reporting with sourcing language to the same effect").  Of course, some statements in the article do sufficiently attribute their assertions to a document in Gladstone's submission. But the "specific statements that [Plaintiffs] discuss as adding up to an untrue gist" do not.  *Broder v. Nexstar Broad. Grp., Inc.*, 2021 WL 2273470, at *13 (Tex. App.—Austin 2021, no pet.).  As a result, the gist of the article and tweet is *not* that some third party has accused Plaintiffs of enriching themselves at GWG's expense; it is that Plaintiffs actually did so.

The Court thus **DENIES** Gladstone's motion to dismiss based on the statutory media privileges.

## V.

Gladstone next argues that "Plaintiffs' claims fail because they challenge protected opinion."  Docket No. 19 at 26.  He asserts that the alleged gist of the article and tweet and the specific statements within the article are "not objectively verifiable." *Id.* at 26–27.  Once again, the Court disagrees.

Both the U.S. and Texas constitutions protect opinion.  *See Gertz*, 418 U.S. at 339–40 (1974) (explaining that the First Amendment protects opinions, but "there is no constitutional value in false statements of fact"); TEX. CONST. ART. 1, § 8. Generally, opinions are "statements that are not verifiable as false."  *Neely v. Wilson*, 418 S.W.3d 52, 62 (Tex. 2013) (citing *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 21–22 (1990)).  "[E]ven when a statement *is* verifiable as false, it does not give

rise to liability if the 'entire context in which it was made' discloses that it is merely an opinion masquerading as fact." *Tatum*, 554 S.W.3d at 639 (quoting *Bentley v. Bunton*, 94 S.W.3d 561, 581 (Tex. 2002)); *see also Sabal v. Anti-Defamation League*, 2024 WL 1892303, at *5 (N.D. Tex. Apr. 30, 2024) (stating that context "may reveal that an opinion instead functions as a factual assertion."); *Milkovich*, 491 U.S. at 19 ("Simply couching statements in terms of opinion does not dispel [defamatory] implications . . . .").

Thus, to determine whether the publications here are opinion, the Court must consider both their verifiability and context. In doing so, the Court views the publications from "the perspective of a reasonable person's perception of the entirety of the communication, not from isolated statements." *Lilith Fund for Reproductive Equity v. Dickson*, 662 S.W.3d 355, 363 (Tex. 2023); *see also Bentley*, 94 S.W.3d at 579. This reasonable person "reads communications in their entirety and is aware of contemporary events," and is "cognizant of the speaker's method and style of dissemination." *Lilith Fund*, 662 S.W.3d at 363–64. Further, "[c]ourts should consider whether the overall language conveys a personal viewpoint about the facts." *Id.*; *see also Tatum*, 554 S.W.3d at 639–40 (holding that "language that conveys a personal viewpoint rather than an objective recitation of fact" was non-actionable opinion).

Gladstone focuses his argument on verifiability, arguing, for example, that "[w]hether one 'engineered' a result, as opposed to influenced or was involved, is in the eye of the beholder" and therefore non-verifiable. Docket No. 19 at 26. Similarly,

he claims that "[w]hether a transaction is a 'sham' or funds 'wrongfully' obtained . . . is also not objectively verifiable." *Id.* at 27. The Court is unpersuaded. These examples are certainly "capable of objective proof as true or false." *Carter*, 573 S.W.3d at 795 (Tex. 2019). It is either true or false that Heppner "engineered" the transaction. If he merely influenced or was involved in the transaction, then he did not engineer it, and the statement is false. Likewise, the transaction was either a "sham," or it was a legitimate, arms-length deal. Same regarding "wrongfully" obtaining funds.

Gladstone, moreover, fails to address context. "[E]ven when a statement *is* verifiable as false, it does not give rise to liability if the entire context in which it was made discloses that it is merely an opinion masquerading as fact." *Tatum*, 554 S.W.3d at 639 (cleaned up). Here, the publication's entire context reveals that it is not opinion dressed up as fact. Rather, "[c]ontextual clues plausibly suggest to a reasonable reader" that Gladstone was stating facts, not expressing his opinion. *Sabal*, 2024 WL 1892303, at *5. The article, tweet, and statements, for example, lack the "first person, informal style" that the *Tatum* court highlighted in finding that an otherwise defamatory column was privileged as an opinion. 554 S.W.3d at 639 (noting that column was replete with language indicating an opinion, like "So I guess," "I think," "I understand," and "the last thing I want to do"). In fact, the publications here employ a formal, objective, and reportorial tone. A reasonable person could plausibly take these contextual clues to indicate that the publications

24

do not "convey[] a personal viewpoint," but rather "an objective recitation of fact." *Id.* at 639.

Accordingly, the Court **DENIES** Gladstone's motion to dismiss the claims as unverifiable opinion.[5]

## VI.

Finally, Gladstone argues that Plaintiffs have not plausibly alleged that he acted with actual malice, a necessary element of defamation in this case.  Docket No. 19 at 34.

As noted above, a plaintiff alleging defamation under Texas law must state that the defendant made the statement with the requisite degree of fault.  *Tatum*, 554 S.W.3d at 623.  The "status of the person alleging defamation determines the requisite degree of fault." *Walker*, 938 F.3d at 744.  A "public figure" must show that the publisher of the statement acted with "actual malice." *Id.*  The parties agree that Plaintiffs are "limited public figures," meaning they are public figures for the purpose of this lawsuit.  *See* Docket No. 19 at 28 n.15.

"Actual malice is more than ill will." *Immanuel v. Cable News Network, Inc.*, 618 F. Supp. 3d 557, 566 (S.D. Tex. 2022).  Rather, it means that the defendant made the statement with knowledge of its falsity or with reckless disregard for its truth. *Walker*, 938 F.3d at 744.  A defendant acts with reckless disregard when it "actually

---

[5] Gladstone also argues that the article and tweet contain "rhetorical hyperbole."  Docket No. 19 at 26.  "Rhetorical hyperbole" is a subset of opinion, which Texas courts have "defined as extravagant exaggeration that is employed for rhetorical effect." *Backes v. Misko*, 486 S.W.3d 7, 26 (Tex. App.—Dallas 2015, pet. denied) (cleaned up).  That argument fails for the same reasons discussed above: a reasonable person reading the article and tweet in their full context would not interpret their gist to be "extravagant exaggeration that is employed for rhetorical effect." *Id.*

entertains serious doubts" as to the statement's truth.  *Immanuel*, 618 F. Supp. 3d at 566 (citation omitted).  Thus, to survive Gladstone's motion, Plaintiffs must have pleaded sufficient facts to create a plausible inference that Gladstone knew that his publications were false or seriously doubted their truth.  *See, e.g., Walker*, 938 F.3d at 745; *Bostic*, 2023 WL 2317789, at *7.

*Walker* illustrates how plaintiffs can fall short of that standard.  938 F.3d 724. There, the Fifth Circuit held that the plaintiff failed to plead more than "scant assertions" regarding actual malice, highlighting the complaint's failure to allege "the existence or contents of specific discussions, correspondence, or supporting documentation provided to any of the media defendants . . . purporting to correct any errors or misstatements in the publications."  *Id.* at 745.

Here, in contrast, Plaintiffs have adequately pleaded actual malice.  They allege they "repeatedly notified Gladstone of specific factual errors in the Article both before and after its publication, yet Gladstone rejected this information and the proposed corrections to serve his preconceived agenda of enticing readers with salacious half-truths, misleading implications, and a preconceived narrative. . . ." Docket No. 1 ¶ 7.  This is not a "scant assertion[]," moreover, because the complaint discusses at length the communications between the parties and includes those communications as attachments to the complaint.  *See, e.g., id.* ¶¶ 51–66; *id.*, Exs. B–E.  In one exchange, for example, Plaintiffs disputed Gladstone's assertion that Beneficient spent $20 million to buy a tech company owned by Heppner whose assets "were over a decade old, and were soon written off."  *Id.* ¶¶ 58, 90, 93; *id.*, Ex. C

at 4.  Plaintiffs explained that the assets were "written off" only "for financial reporting purposes" and that they "are currently in use and still part of Ben's internal IT stack and infrastructure."  *Id.*  Heppner's original assertion appears verbatim, however, in the article.  Docket No. 20, Ex. 25 at 4 ("The technology assets were more than a decade old and were soon written off . . . .").  Accepting these allegations as true and viewing them in the light most favorable to Plaintiffs, as required at this stage, the Court concludes that Plaintiffs have sufficiently created a reasonable inference that Gladstone acted with actual malice.  *See Raj*, 714 F.3d at 329–30.

Gladstone contends that his communications with Plaintiffs "show *lack* of malice."  Docket No. 19 at 29.  He argues that the emails demonstrate Plaintiffs were "confirming accuracy but hoping to convince *The Journal* not to amplify what Plaintiffs had quietly admitted," or were "offer[ing] trivial details."  *Id.*  This mischaracterizes the parties' communications, which plainly demonstrate Plaintiffs' contesting Gladstone's "determined" facts and informing him about material facts that he had omitted.  *See, e.g.,* Docket No. 1, Ex. B at 1.

Plaintiffs need not conclusively prove at this point in the proceeding that Gladstone acted with actual malice.  After all, "[i]t is rare that a plaintiff will be able to definitively assert what a defendant knew prior to publication—and that is not the standard at a motion to dismiss."  *Bostic*, 2023 WL 2317789, at *11.  Rather, Plaintiffs must merely "allege facts which plausibly suggest" that Gladstone acted with actual malice.  *Id.* at *7.  They have done so.

Gladstone's motion to dismiss the complaint on this basis is **DENIED**.

27

## VII.

For the reasons stated above, the Court **DENIES** Gladstone's motion to dismiss.

So **ORDERED** and **SIGNED** this **22nd** day of **May, 2024.**

_____
JEREMY D. KERNODLE
UNITED STATES DISTRICT JUDGE

28